## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

United States of America,

                    Plaintiff,          Case No. 21-cr-20393-3

v.                                      Judith E. Levy
                                        United States District Judge
Lawrence Mark Sherman,
                                        Mag. Judge Kimberly G. Altman
                    Defendant.

_____/

## OPINION AND ORDER DENYING
## DEFENDANT'S MOTION FOR A NEW TRIAL [279]

Defendant Lawrence Mark Sherman filed a motion for a new trial under Federal Rule of Criminal Procedure 33(a). (ECF No. 279.) For the reasons set forth below, Defendant's motion is DENIED.

## I.   Background

On December 14, 2023, a jury convicted Defendant of (1) one count of conspiracy to possess with intent to distribute and to distribute controlled substances, in violation of 21 U.S.C. §§ 841(a)(1) and 846, and (2) nineteen counts of unlawful distribution of controlled substances, aiding and abetting, in violation of 21 U.S.C. § 841(a)(1)

and 18 U.S.C. § 2. (ECF Nos. 196, 234.) The second superseding indictment alleged that Defendant was a licensed medical doctor who worked as a physician at Tranquility Wellness Center and that he unlawfully issued controlled substance prescriptions as part of a conspiracy to distribute prescription drug controlled substances. (*See* ECF No. 196.)

On February 12, 2024, Defendant filed his motion for a new trial pursuant to Rule 33(a).[1] (ECF No. 279.) The motion is fully briefed. (ECF Nos. 297, 302.) Defendant argues that he is entitled to a new trial under Rule 33's "interest of justice standard" because the Court committed "substantial legal error[s]." (ECF No. 279, PageID.5433–5434.) The errors identified by Defendant are discussed below. Defendant does not demonstrate that a new trial is warranted.

---

[1] "Absent newly discovered evidence, a Rule 33 motion must be filed within 14 days of the verdict." *United States v. Watts*, No. 21-5302, 2022 WL 706603, at *8 (6th Cir. Mar. 9, 2022) (citing Fed. R. Crim. P. 33(b)(2)). Defendant's motion is not grounded on newly discovered evidence. The deadline for filing his motion was therefore fourteen days after the jury returned its verdict on December 14, 2023. But based on the parties' stipulations, the deadline for Defendant to file a Rule 33 motion was extended to February 12, 2024. (ECF Nos. 242, 261, 264.)

## II.    Legal Standard

Rule 33(a) states in relevant part: "Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). "The rule 'does not define 'interest[ ] of justice' and the courts have had little success in trying to generalize its meaning.'" *United States v. Robinson*, 99 F.4th 344, 367 (6th Cir. 2024) (alteration in original) (quoting *United States v. Munoz*, 605 F.3d 359, 373 (6th Cir. 2010)). But "[i]t is . . . 'widely agreed that Rule 33's "interest of justice" standard allows the grant of a new trial where substantial legal error has occurred.'" *Id.* (quoting *Munoz*, 605 F.3d at 373).

"The defendant bears the burden of proving that a new trial should be granted." *United States v. Davis*, 15 F.3d 526, 531 (6th Cir. 1994) (citing *United States v. Seago*, 930 F.2d 482, 488 (6th Cir. 1991)); *see United States v. Pierce*, 62 F.3d 818, 823 (6th Cir. 1995). "The decision whether to grant a new trial is left to the sound discretion of the district court." *United States v. Dunnican*, 961 F.3d 859, 878 (6th Cir. 2020) (quoting *Pierce*, 62 F.3d at 823).

## III.   Analysis

Defendant argues that the Court committed the following errors that require a new trial: (1) precluding the introduction of his personal patient notes, (2) admitting summary charts introduced by two government witnesses, Department of Health and Human Services Office of Inspector General Special Agent Nicholas Napolitano and Financial Investigations Contractor Karli Klein, (3) allowing improper lay testimony from those two government witnesses, (4) not permitting an additional recording to be played, and (5) including a jury instruction on deliberate ignorance. In addition, Defendant argues that he should receive a new trial because of the cumulative effect of the Court's errors. For the reasons set forth below, these arguments do not entitle Defendant to relief. He does not satisfy his burden of demonstrating that a new trial should be granted.

### A. Defendant's Personal Patient Notes

Defendant first takes issue with the Court precluding him from admitting his personal patient notes. He indicates that the notes were handwritten in a notebook and that they "detail all of his patient interactions and medical findings, which went to the heart of the issue

4

in this case—whether [he] prescribed controlled substances in the ordinary course of professional practice and for a legitimate medical purpose." (ECF No. 279, PageID.5434.) Defendant states that "[t]he preclusion of evidence harmed [him] as it limited his medical records to those put into his electronic medical record rather than his entire record of the patient." (*Id.*)

In his motion, Defendant does not clearly identify the particular documents that he believes should have been admitted. In challenging the Court's findings, he faults the Court for not admitting his "notebooks." (*See id.* at PageID.5434–5437; ECF No. 302, PageID.5639 ("In his Motion, [Defendant] argued that the Court erred by precluding [him] from admitting the notebooks used to document patient examinations.").) The government provides the following context in its response:

> [Co-Defendants] Janeice Burrell and Angelo Smith owned and operated Tranquility, and they hired [Defendant] to work there. (R. 217: Tr., 1134; R. 219; Tr. 1363). They also hired [Co-Defendant] Akeyla Bell to work at Tranquility. (R. 219: Tr., 1397).

\* \* \*

5

> While questioning Janeice Burrell, Smith, and Bell,
> [Defendant's] counsel asked about [Defendant] writing in
> notebooks while or after seeing patients. (R. 218: Tr., 1268;
> R. 219: Tr., 1590-93; R. 270: Tr., 3963-65). He sought to
> introduce a notebook page related to Angelo Smith, Def.
> Exhibit 114, which [Defendant] describes in his motion as
> his "personal patient notes." (R. 219: Tr., 1590-93). Later,
> [Defendant's] counsel sought to admit two notebook pages,
> Def. Exhibits 101E and 101F, while questioning FBI
> [Special] Agent [Brian] Koczenasz. (R. 276: Tr., 5302-06 &
> 5327-37).

(ECF No. 297, PageID.5555–5556.) In his reply, Defendant does not

dispute that the proposed exhibits identified by the government are the

ones at issue. (*See* ECF No. 302.) The trial transcript also reflects that

Defendant may have attempted to admit certain pages from a

notebook—and not one or more entire notebooks. (*See* ECF No. 276,

PageID.5338 ("[Defense Counsel] MR. CHAPMAN: Your Honor, I've

isolated the specific page for each patient the Government has brought

in at issue, not the whole notebook.").) Yet the Court addresses

Defendant's arguments involving his "notebooks" below, given that

those are the arguments he presents in his briefing.

Defendant argues that the Court erred in not allowing him to

admit his personal patient notes because (1) his notebooks were

properly authenticated by certain witnesses, particularly Koczenasz,

(2) his notebooks were relevant, and (3) his notebooks fell under the business records hearsay exception in Rule 803(6). These arguments lack merit. Defendant does not show that the Court erred in concluding that the notes were not admissible.

### i.   Authentication

Defendant argues that his notebooks were properly authenticated. He argues that "the notebooks have been authenticated by several witnesses, including Agent Koczenasz." (ECF No. 302, PageID.5643; *see* ECF No. 279, PageID.5434–5435.) The Court disagrees.

"[T]he authentication of evidence is 'a condition precedent to admissibility.'" *United States v. Hall*, 20 F.4th 1085, 1104 (6th Cir. 2022) (quoting *United States v. Fults*, 639 F. App'x 366, 373 (6th Cir. 2016)). Federal Rule of Evidence 901(a) states that "[t]o satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). "Rule 901(b) sets forth a non-exhaustive list that satisfies the requirement, including testimony from a witness 'with knowledge' that the item 'is what it is claimed to be.'" *United States v. Bell*, No. 17-20183, 2022 WL

981578, at *11 (E.D. Mich. Mar. 31, 2022) (quoting Fed. R. Evid. 901(b)(1)). "The proponent must provide sufficient evidence 'so that a reasonable juror could find in favor of authenticity or identification.'" *United States v. Craig*, 953 F.3d 898, 902–03 (6th Cir. 2020) (quoting *United States v. Jones*, 107 F.3d 1147, 1150 n.1 (6th Cir. 1997); citing *United States v. Thomas*, 701 F. App'x 414, 418 (6th Cir. 2017)); *United States v. Lewis*, No. 19-6148, 2022 WL 216571, at *13 (6th Cir. Jan. 25, 2022) ("[R]ule [901(a)] demands only enough proof to allow that 'a reasonable juror could find in favor of authenticity or identification,' and '[t]he rest is up to the jury.'" (last alteration in original) (quoting *Jones*, 107 F.3d at 1150 n.1)), *cert. denied sub nom. Turner v. United States*, 143 S. Ct. 328 (2022).

Defendant argues that the notebooks were authenticated through the testimony of Burrell, Smith, and Bell, given that these witnesses identified Defendant's notebooks, described them, and stated that Defendant used them to take notes. (ECF No. 279, PageID.5435 (citing ECF No. 218, PageID.1331; ECF No. 219, PageID.1590–1591); ECF No. 302, PageID.5643 ("The testimony of [Defendant's] former co-defendants described these notebooks in sufficient detail and was

identified in court by Akeyla Bell. (Cite)."[2].) But the testimony of these individuals did not satisfy the requirement of authenticating Defendant's notes or notebooks. *See* Fed. R. Evid. 901(a)–(b)(1). Burrell, Smith, and Bell did not testify that a certain notebook—or a specific page from a notebook—contained Defendant's personal patient notes. Burrell indicated that Defendant "wrote down his treatments in a notebook." (ECF No. 218, PageID.1268.) She testified that for refill visits, he would put notes into the Practice Fusion chart "[o]r in his notebook." (*Id.* at PageID.1331.) Burrell indicated that the notes in his notebook would not get copied into Practice Fusion. (*Id.*) But she also stated that Defendant entered his own notes regarding physical examinations into Practice Fusion. (*Id.* at PageID.1268.) Smith testified that when Defendant saw patients, he wrote down information in a notebook that he carried with him all the time. (ECF No. 219, PageID.1590.) Smith did not "read the notebook or the notes that [Defendant] wrote." (*Id.* at PageID.1591.) Smith stated that Defendant "took notes during the exam throughout the day" and that Defendant

---

[2] "(Cite)" was possibly intended to serve as a placeholder in Defendant's reply brief for a citation that supports Defendant's assertion. A citation was apparently not inserted before Defendant filed his reply.

would copy his notes into Practice Fusion "later after he got home." (*Id.* at PageID.1590.) Smith also stated that he "believe[d]" that there were "quite a few" notebooks. (*Id.*) Bell testified that Defendant always carried a notebook and that there were notebooks in his office. (ECF No. 270, PageID.3963–3964.) She testified that "when he come out from a patient, he would write what happened with that patient in that notebook." (*Id.* at PageID.3964.) Bell indicated that Defendant wrote in a notebook after he saw "[e]very patient." (*Id.* at PageID.3965.) She could not read what the notes said. (*Id.* at PageID.3964.) Thus, Burrell, Smith, and Bell testified about Defendant's notetaking; however, these witnesses did not testify that Defendant's proposed exhibits were "what [they were] claimed to be." Fed. R. Evid. 901(b)(1).

Defendant further argues that the notebooks were authenticated because Bell identified them in Court. (ECF No. 302, PageID.5643.) But Bell did not do so. She did not identify a particular notebook as being a notebook that Defendant carried, used for patient notes, or kept in his office at Tranquility. On cross-examination, defense counsel asked Bell whether she ever saw Defendant carry a spiral-bound notebook "[j]ust like" a notebook Defendant had with him when sitting at counsel table

10

during the trial.[3] (ECF No. 270, PageID.3963.) Bell responded: "Yes, he did have a notebook." (*Id.*) In her response, Bell did not provide any details about the notebook Defendant carried when he worked at Tranquility. She did not indicate how the notebook Defendant possessed during the trial compared to the notebook he used to record information following patient visits. Ultimately, Bell did not identify a notebook as being the notebook Defendant used for patient notes. Therefore, this portion of her testimony did not satisfy Rule 901's authentication requirement. In sum, Defendant does not point to testimony from Burrell, Smith, or Bell that established that the notebooks—or the documents he refers to as "personal patient notes"—were, in fact, the notes he took after seeing each patient. *See* Fed. R. Evid. 901(a)–(b)(1).

Defendant also argues that Koczenasz "is the best to testify to the authenticity of [Defendant's] notebooks" (ECF No. 279, PageID.5435) despite Koczenasz's "non-participation in the execution of the search warrants" related to this case. (ECF No. 302, PageID.5643.) Defendant asserts—without citing to the record or legal authority—that

---

[3] Defense counsel indicated that the notebook in Defendant's possession during the trial was not an exhibit taken from Tranquility. (ECF No. 270, PageID.3965.)

> [g]iven Agent Koczenasz's role in this case's underlying investigation, his testimony identifying evidence seized during the execution of the search warrant, and his handling of the notebooks while in the Government's custody, Agent Koczenasz was perfectly capable of verifying [Defendant's] notebooks were the same unchanged notebooks seized through the executed search warrant.

(*Id.* at PageID.5643–5644; *see* ECF No. 279, PageID.5435–5436.) This argument lacks merit because Koczenasz could not testify that the proposed exhibits were Defendant's personal patient notes for purposes of authentication under Rule 901. Koczenasz was not at Tranquility when Defendant worked there or when Defendant wrote in his notebooks. Koczenasz testified that the notebooks were seized from Defendant's house and possibly his car. (ECF No. 276, PageID.5337 ("I was not at [Defendant's home], but, from what I remember of the search warrant log for where the evidence was found, several of the [notebooks] were found at his house. I can't remember if they were all together or in separate rooms, and I think at least one of them may have been in his car.").) However, Koczenasz was not present when search warrants were executed at Tranquility and Defendant's home. (ECF No. 275, PageID.5138–5139; ECF No. 276, PageID.5302–5303, 5337.) For these reasons, Koczenasz lacked the necessary knowledge to authenticate the

notes or notebooks under Rule 901. He could not testify as to what the notebooks were, what they contained, and whether they were "what [they were] claimed to be." Fed. R. Evid. 901(b)(1). Defendant does not show that the notebooks were properly authenticated by this witness— or by any other witness—and that the Court erred. *See Lyngaas v. Curaden Ag*, 992 F.3d 412, 431 (6th Cir. 2021) (concluding that "the district court did not abuse its discretion in ruling that the logs [at issue] were inadmissible as evidence" because "[b]y not presenting anyone to attest as to how the logs at issue were created or to personally vouch for their accuracy, [the plaintiff] failed to satisfy the requirements of Rule 901").

### ii.   Relevance

Defendant next argues that his notebooks should have been admitted because they were relevant. He argues that the notebooks were relevant because

> they have additional information that was not recorded by
> the electronic medical record.[4]   R. 218, PageID #1331.

---

[4] The Court notes that there is inconsistent information in the record and the briefing as to whether the notebooks had "additional information" that was not in the electronic medical record. In arguing that the notebooks were relevant because they contained "additional information," Defendant cites to Burrell's testimony. (ECF No. 279, PageID.5436 (citing ECF No. 218, PageID.1331).) He presumably

Further, witness testimony corroborated that [Defendant] would bring notebooks with him, which is where he recorded his notes during patient examinations. R. 219, PageID #1590-91. Those notes in his notebook were at times put into the electronic medical record by others,[5] making the notebooks the most reliable document to assess his medical observations and care in real time.

(ECF No. 279, PageID.5436.)

Defendant does not show that the notebooks were relevant. "Under the Federal Rules of Evidence, an item of evidence is admissible only if it is relevant, i.e., only if it tends to make a consequential fact more or less probable than it would be without the evidence." *United*

---

intends to reference her testimony that the notes Defendant took in his notebook regarding refill visits would not get copied into Practice Fusion. (ECF No. 218, PageID.1331.) In his reply, however, Defendant indicates that the notebooks contain the same information as that which appears in the electronic medical record. (*See* ECF No. 302, PageID.5640 ("[A] comparison between the undercover videos, [Defendant's] handwritten notes, and the electronic medical record all contain the same information."); *id.* at PageID.5644 ("Upon comparison, [Defendant's] notebooks perfectly align with the electronic medical records and the video evidence produced by the undercover recordings, substantiating the notebooks' reliability.").) Moreover, defense counsel indicated during the trial that "the[ ] notebooks match up with the EMR [electronic medical record]." (ECF No. 276, PageID.5331.) He stated that "[t]he fact that these notebooks match up with the EMR is the principal purpose for offering the notebooks into evidence." (*Id.*)

[5] The government correctly points out that "Burrell and Smith testified that [Defendant] put his own notes in Practice Fusion. (R. 218: Tr., 1268; R. 219: Tr., 1590). Bell testified that she could not access Practice Fusion. (R. 270: Tr., 3963-64, 3987)." (ECF No. 297, PageID.5558.)

*States v. Smith-Kilpatrick*, 942 F.3d 734, 741 (6th Cir. 2019) (citing Fed. R. Evid. 401, 402). Here, Defendant does not indicate what information in the notebooks would have "ma[d]e a consequential fact more or less probable." *Id.* And Defendant does not identify any "additional information" in the notebooks that was not recorded in the electronic medical record and that was relevant. Nor does he demonstrate that admitting the notebooks would have affected the outcome of the case. To the extent the notebooks contained the same information that appeared in the electronic medical record, *see supra* note 4; (*see* ECF No. 276, PageID.5331; ECF No. 302, PageID.5640, 5644), the notebooks were "duplicative of the electronic medical record," as the Court determined during the trial based on defense counsel's representations to the Court that the notebooks "match[ed] up" with the electronic medical record.[6] (ECF No. 276, PageID.5331, 5336.) Thus, Defendant does not show that the Court incorrectly concluded that the notebooks were not relevant. *See United States v. Buendia*, 907 F.3d 399, 402 (6th Cir. 2018) ("The kickback-expenditure evidence would . . . have made no

---

[6] Defense counsel did not disagree with the Court's finding that the notebooks were "duplicative." (ECF No. 276, PageID.5336, 5338.)

15

fact of consequence more or less probable, so the district court correctly excluded the evidence as irrelevant." (citing Fed. R. Evid. 401, 402)).

### iii.   Business Records Hearsay Exception

Defendant argues that his notebooks should have been admitted because they "f[e]ll within the business records hearsay exception" found in Federal Rule of Evidence 803(6). (ECF No. 279, PageID.5437.) During the trial, Defendant did not dispute that his notes or notebooks were hearsay. (*See* ECF No. 276, PageID.5327–5328, 5339–5340.) He does not dispute that now.

Federal Rule of Evidence 801(c) defines "hearsay" as "a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). "Hearsay is not admissible unless" provided otherwise by "a federal statute," the Federal Rules of Evidence, or "other rules prescribed by the Supreme Court." Fed. R. Evid. 802.

Rule 803(6) "contains a hearsay exception for the records of an organization." 30B Charles Alan Wright et al., *Fed. Prac. & Proc. Evid.* § 6862 (2024 ed.). "The rule is colloquially known as the 'business

records' hearsay exception, as its most common uses involve the records of commercial entities." *Id.* Rule 803(6) provides as follows:

> **(6) Records of a Regularly Conducted Activity.** A record of an act, event, condition, opinion, or diagnosis [is not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness,] if:
>
> > **(A)** the record was made at or near the time by—or from information transmitted by—someone with knowledge;
> >
> > **(B)** the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;
> >
> > **(C)** making the record was a regular practice of that activity;
> >
> > **(D)** all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and
> >
> > **(E)** the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

Fed. R. Evid. 803(6).

Defendant argues that his notebooks "f[e]ll within the business records hearsay exception" because of (1) testimony from Burrell, Smith, and Bell regarding Defendant's general notetaking practice and

(2) Koczenasz's testimony regarding the appearance of the notebooks that were seized in evidence. (ECF No. 279, PageID.5437; ECF No. 302, PageID.5640 (citing ECF No. 218, PageID.1268; ECF No. 219, PageID.1590; ECF No. 270, PageID.3965; ECF No. 276, PageID.5302); ECF No. 302, PageID.5643 (citing ECF No. 218, PageID.1268; ECF No. 219, PageID.1590).) But this testimony did not satisfy the requirements of Rule 803(6). The testimony that Defendant points to did not demonstrate that the specific notes he sought to admit were the result of Tranquility's routine record keeping. *See* 30B Charles Alan Wright et al., *Fed. Prac. & Proc. Evid.* § 6864 (2024 ed.) ("Federal Rule of Evidence 803(6) relies on the routine nature of organizational record keeping to ensure the reliability of the records it admits.").

As noted, the language of Rule 803(6) requires a showing that

**(A)** *the record* was made at or near the time by—or from information transmitted by—someone with knowledge;

**(B)** *the record* was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit; [and]

**(C)** making *the record* was a regular practice of that activity[.]

Fed. R. Evid. 803(6)(A)–(C) (emphasis added); *see* Fed. R. Evid. 803(6)(D) (requiring that "all the[ ] conditions" in Rule 803(6)(A) through (C) be "shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification"). Yet the testimony Defendant references did not discuss the circumstances surrounding the creation of the actual notes he believes should have been admitted. *See* Fed. R. Evid. 803(6)(A). Nor did the testimony establish that the notes at issue were regularly made and regularly kept. *See* Fed. R. Evid. 803(6)(B)–(C); 30B Charles Alan Wright et al., *Fed. Prac. & Proc. Evid.* § 6864 (2024 ed.) ("The[ ] two requirements [in Rule 803(6)(B) and (C)] are related but distinct. Each corresponds to a separate activity: the record must be regularly made and then regularly kept. . . . While the isolated making of records is more typically pointed out in the case law, the rule's true focus is on the regular keeping of records. Recall that the rationale for the rule is the reliability of records that the organization plans to rely on at a later time. Consequently, courts should not overlook the regular keeping of records as a key determinant of admissibility."). Said differently, the testimony Defendant cites did not

satisfy the conditions in Rule 803(6)(A) through (C).[7] Defendant does not show that the requirements of Rule 803(6) were met with respect to the specific notes or notebooks he sought to admit. He therefore does not show that the business records hearsay exception applied and that the Court erred in not admitting the notes or notebooks at issue under Rule 803(6).

For the reasons set forth above, the Court finds that Defendant's personal patient notes or notebooks were not authenticated, were not relevant, and were not admissible under Rule 803(6)'s business records hearsay exception. Accordingly, Defendant does not establish that the Court made a substantial legal error in not admitting his personal patient notes or notebooks.

## B. Summary Charts

Defendant argues that the Court erred by admitting summary charts "[c]ontrary to the requirements" in *United States v. Bray*, 139 F.3d 1104 (6th Cir. 1998). (ECF No. 279, PageID.5437.) He argues that

---

[7] For purposes of this analysis, the Court assumes that the testimony Defendant references was provided by a "qualified witness." *See* Fed. R. Evid. 803(6)(D); *United States v. Trevino*, 7 F.4th 414, 430 (6th Cir. 2021) ("When a witness is used to lay the foundation for admitting records under Rule 803(6), all that is required is that the witness be familiar with the record keeping system." (quoting *United States v. Ramer*, 883 F.3d 659, 678 (6th Cir. 2018))).

summary charts introduced by Napolitano and Klein were erroneously admitted because the government "failed to disclosure [sic] the specific underlying data relied on to create the[m]." (*Id.* at PageID.5438; *see* ECF No. 302, PageID.5645 ("As explained at trial, the thrust of [Defendant's] objection to the introduction of summary charts was due to the Government not providing [Defendant] with the documents underlying these summary charts.").) According to Defendant, the summary charts "include Government's Exhibits 137 (Summary of Practice Fusion Prescriptions by Drug Name), 138 (Summary of Practice Fusion Prescriptions by Drug Schedule), 140 (Estimated Street Value in Metro Detroit in Approx. 2020-2021), 166-174 (all which relate to [Defendant's] income), and 177 (Summary of Controlled Substance Prescriptions Issued During Travel)." (ECF No. 279, PageID.5437–5438.) In addition, Defendant takes issue with the admission of "Government's Exhibits 166 and 170," which he claims were improperly embellished. (*Id.* at PageID.5439.) Defendant's arguments fail.

Federal Rule of Evidence 1006 provides:

> The proponent may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court. The proponent must make the originals or duplicates

available for examination or copying, or both, by other parties at a reasonable time and place. And the court may order the proponent to produce them in court.

Fed. R. Evid. 1006.

The Sixth Circuit has "interpreted Rule 1006 to include five distinct requirements in order for a summary exhibit to be deemed admissible." *United States v. Harris*, 881 F.3d 945, 950 (6th Cir. 2018) (citing *Bray*, 139 F.3d at 1109–10). The requirements—referred to as the "*Bray* factors," *id.*—are:

> (1) the underlying documents must be so voluminous that they cannot be conveniently examined in court, (2) the proponent of the summary must have made the documents available for examination or copying at a reasonable time and place, (3) the underlying documents must be admissible in evidence, (4) the summary must be accurate and nonprejudicial, and (5) the summary must be properly introduced through the testimony of a witness who supervised its preparation.

*United States v. Jamieson*, 427 F.3d 394, 409 (6th Cir. 2005) (quoting *United States v. Modena*, 302 F.3d 626, 633 (6th Cir. 2002)). The second factor is the only one at issue here.

Defendant argues that

the Government did not provide advanced notice of the documents used to create the[ ] summary charts other than

22

vague assertions that it is a summary of certain information. *See* Government's Exhibit List. Without the specific identification and production of documents that were relied on in each summary chart, the summary chart fails to pass under *Bray's* second factor. *Modena*, 302 F.3d at 633.

(ECF No. 279, PageID.5439.)

The government indicates in its response, however, that there is no issue under *Bray* because the government made the underlying documents available to Defendant "for examination or copying at a reasonable time and place." *Jamieson*, 427 F.3d at 409. The government states that

> [a]s to the second factor, not only were the underlying documents supporting the summary charts "made available" for inspection in late 2021 as required by Rule 1006, the documents were (1) produced to the defense, (2) marked as exhibits, (3) admitted as exhibits . . . , and (4) [Defendant's] counsel admitted that he had all underlying documents. (R. 274, Tr., 4859, 4872-73, 4891-92).

> [Defendant] claims that the government had a "duty to state when and where" the underlying documents would be made available, citing *United States v. Modena*, 302 F.3d 626, 633 (6th Cir. 2002). (R. 179, Motion, 5438). But in *Modena* the government only made the documents available; here the government produced them and identified them in its discovery notice, the defense reviewed evidence at the FBI on January 24, 2022, and the government admitted them as exhibits. Also, even though in *Modena* the government erred

23

in how it made documents available, the error did not equate to a violation of Rule 1006 or exclusion of the exhibit. Here, the defense had a "when and where" to review the materials.

[Defendant's] complaint at trial was that he did not get a copy of the summary exhibits as early as he wished. (R. 274, Tr., 4872-73). But as the Court noted, Rule 1006 does not require the government to provide a copy of the summary or even the underlying documents to the defense (*Id.* at 4891-92 *citing Jamieson*). And [Defendant] cross examined the witnesses about the summary charts and could have offered his own exhibits as rebuttal evidence, which fulfills the purpose of Rule 1006. *United States v. Bray*, 139 F.3d 1104, 1109 (6th Cir. 1998).

(ECF No. 297, PageID.5563–5564.)

In his reply, Defendant does not factually dispute the information provided by the government indicating that it made available the underlying documents to Defendant. (*See* ECF No. 302, PageID.5645–5646.) And as the government points out, defense counsel conveyed to the Court during the trial that he had the underlying records. (ECF No. 274, PageID.4858–4859 (agreeing that he had the records used by Napolitano); *id.* at PageID.4873 (stating that he was challenging the disclosure of certain summaries and that he "didn't want to make it sound like [he] was complaining about" the disclosure of underlying records used by Klein).)

Defendant argues in his reply that the government's assertions regarding the underlying documents "hide[ ] a major complication overlooked by the Court during trial: both Agent Napolitano and Ms. Klein created undisclosed documents to prepare for each summary chart and, through this undisclosed document, created the summary charts." (ECF No. 302, PageID.5645.) To the extent Defendant is arguing that he was entitled to review those "undisclosed documents," his argument is flawed. He does not identify the "undisclosed documents" he believes he was entitled to examine, and he provides no legal basis for the Court to find in his favor. Under Rule 1006, the government "had a duty to state when and where *the documents underlying its summaries* could be viewed." *Modena*, 302 F.3d at 633 (emphasis added) (internal citation and quotation marks omitted); *Jamieson*, 427 F.3d at 409; *Bray*, 139 F.3d at 1109; 31 Charles Alan Wright et al., *Fed. Prac. & Proc. Evid.* § 8045 (2d ed. 2024) ("Federal Rule of Evidence 1006 . . . requires that the originals or duplicates *of the items summarized* be made available for examination or copying." (emphasis added)). That duty applied with respect to the "voluminous writings, recordings, or photographs" used to create the summaries.

Fed. R. Evid. 1006. But no such duty existed with respect to other documents, including unidentified documents potentially created by Napolitano and Klein. The duty also did not apply to the summary charts themselves. *Jamieson*, 427 F.3d at 409–10 ("Rule 1006 does not require . . . that the government provide [the defendant] with a copy of the actual summary."). (*See* ECF No. 274, PageID.4891–4892.) Defendant does not show otherwise. Thus, the language of Rule 1006 forecloses the relief he seeks.

As for Defendant's challenge to the government's Exhibits 166 and 170, Defendant argues that those exhibits

> improperly embellish March to December 2020, seemingly to signify to the jury that, during this specific time, there departed from ordinary earning by [Defendant]. *Bray*, 139 F.3d at 1110. The phase of time highlighted by Government's Exhibits 166 and 170 specifically coincides with the beginning of [Defendant's] work at Tranquility Wellness Center through the end of the calendar year, which would likely result in the improper inference that the large dollar figure amount was due to [Defendant's] "illicit activities." Yet in the emphasized portion at issue, Ms. Klein included a $243,000 IRA distribution taken by [Defendant] and included it in his income, giving the impression that [Defendant] earned a much higher salary through his work as a physician. See R. 274, PageID # 4917-18. As a result, these exhibits should not have been accepted by the court as they are contrary to the rules in *Bray*.

26

(ECF No. 279, PageID.5439.)

The government correctly states in its response that Exhibits 166 and 170 were not admitted. (ECF No. 297, PageID.5562, 5565.) Defendant does not disagree. In fact, Defendant makes no mention of these exhibits in his reply. (*See* ECF No. 302.) Because Exhibits 166 and 170 were not admitted, Defendant's argument that the Court erred by "accept[ing]" them lacks merit. (ECF No. 279, PageID.5439.)

In sum, Defendant does not show that the Court committed a substantial legal error in admitting summary charts that were introduced by Napolitano and Klein.

## C. The Testimony of Napolitano and Klein

Defendant argues that the Court erred by allowing improper lay testimony from Napolitano and Klein, who were not qualified as experts. Defendant argues that Napolitano and Klein "provided both fact and opinion testimony" and therefore "bypass[ed] the requirements of Federal Rules of Evidence 701, 702, and 704." (*Id.* at PageID.5440.) Defendant argues that Napolitano "should have been precluded from testifying about his areas of expertise" and that "Klein's testimony should have been excluded." (*Id.* at PageID.5442.) Defendant does not

indicate that he was prejudiced by the Court admitting the testimony or that the testimony was inaccurate. The Court finds that Defendant does not demonstrate that the Court made a mistake that entitles him to a new trial, as set forth below.

With respect to the rules Defendant references, Rule 701 provides that

> [i]f a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:
>
> **(a)** rationally based on the witness's perception;
>
> **(b)** helpful to clearly understanding the witness's testimony or to determining a fact in issue; and
>
> **(c)** not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Fed. R. Evid. 701. "The party offering testimony under Rule 701 must establish that all three requirements are satisfied." *United States v. Kilpatrick*, 798 F.3d 365, 379 (6th Cir. 2015) (citing *United States v. Freeman*, 730 F.3d 590, 595–96 (6th Cir. 2013)).

Under Rule 702,

> [a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:

28

> **(a)** the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> **(b)** the testimony is based on sufficient facts or data;
>
> **(c)** the testimony is the product of reliable principles and methods; and
>
> **(d)** the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702. Rule 704 provides in relevant part that "[i]n a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense. Those matters are for the trier of fact alone." Fed. R. Evid. 704(b).

The Sixth Circuit has stated that "[t]he function of lay opinion testimony is to 'describ[e] something that the jurors could not otherwise experience for themselves by drawing upon the witness's sensory and experiential observations that were made as a first-hand witness to a particular event.'" *Kilpatrick*, 798 F.3d at 379 (second alteration in original) (quoting *Freeman*, 730 F.3d at 595). "Lay testimony 'results from a process of reasoning familiar in everyday life, whereas an expert's testimony results from a process of reasoning which can be

mastered only by specialists in the field.'" *United States v. Faulkenberry*, 614 F.3d 573, 588 (6th Cir. 2010) (quoting *United States v. White*, 492 F.3d 380, 401 (6th Cir. 2007)). "[W]hen an agent relies on his or her personal knowledge of a particular investigation, the agent's opinion may be lay opinion testimony under Rule 701." *United States v. Johnson*, 830 F. App'x 153, 159 (6th Cir. 2020) (quoting *Kilpatrick*, 798 F.3d at 384). But "[w]hen an agent gives opinions that rely on the agent's specialized training as a law enforcement officer, that testimony is expert testimony, and the agent must be qualified under Rule 702." *Id.* (quoting *Kilpatrick*, 798 F.3d at 384).

### i. *Napolitano's Testimony*

Defendant argues that Napolitano's testimony was improper because Napolitano "used his specialized knowledge and training to describe to the jury, among other things, what the Michigan Automated Prescription Service (MAPS) is and how it works; the drug schedules and their meaning; and drug diversion and how investigators may search for evidence of possible diversion." (ECF No. 279, PageID.5441 (citing ECF No. 274, PageID.4832–4843).) Defendant states that his attorney "objected to the testimony as SA Napolitano had yet to be

qualified as an expert witness but was providing specialized knowledge about the practice of drug diversion." (*Id.* (citing ECF No. 274, PageID.4832–4843).) Defendant questions whether an "average person" knows about the information presented by Napolitano. (*See id.* at PageID.5441–5442.) However, Defendant does not argue that Napolitano's testimony was inaccurate or prejudicial. For the reasons set forth below, Defendant does not show that the Court committed a substantial legal error with respect to Napolitano's testimony.

As noted, Defendant takes issue with Napolitano's testimony regarding MAPS. But this testimony was "not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701(c). Napolitano had knowledge about MAPS through his work on this particular case, given that he reviewed MAPS data related to Defendant. (ECF No. 274, PageID.4835–4836.) Moreover, non-expert witnesses who lacked specialized law enforcement training and experience testified about MAPS based on their own knowledge of it. Smith was asked what MAPS is, to which he responded: "MAPS is a [sic] electronic record of pain medication that is written and prescribed." (ECF No. 219, PageID.1373–1374; *see id.* at PageID.1599–1601; ECF

31

No. 220, PageID.1644–1645.) In addition, Burrell testified about accessing MAPS reports and then altering them. (ECF No. 218, PageID.1281–1283.) Defendant did not object to Smith's or Burrell's testimony about MAPS. (*Id.*; ECF No. 219, PageID.1373–1374.) Nor did he object to Napolitano's testimony regarding MAPS. (ECF No. 274, PageID.4834–4835.) Further, information about MAPS came in through Koczenasz, whose testimony indicated that "nonnarcotics are not usually on MAPS" and that "MAPS only shows controlled substance[s]." (ECF No. 276, PageID.5376, 5382.) Defendant did not object to this testimony either. (*Id.*)

Defendant next challenges Napolitano's testimony about drug schedules. That testimony was not improper because it consisted of factual information that did not require specialized training as a law enforcement officer. *See Johnson*, 830 F. App'x at 159. Napolitano had knowledge of the drug schedules through his involvement in this case; he "created a summary chart based on . . . scheduled prescriptions II through V" using MAPS data and Tranquility's Practice Fusion records. (ECF No. 274, PageID.4837, 4841–4842.) As the government points out, Defendant did not object to the portion of Napolitano's testimony in

which he discussed drug schedules. (ECF No. 297, PageID.5567 (citing ECF No. 274, PageID.4835).)

Defendant also challenges Napolitano's testimony on "drug diversion and how investigators may search for evidence of possible diversion." (ECF No. 279, PageID.5441.) The testimony on drug diversion was not improper. Napolitano defined "diversion" in response to a question from the Court, and Defendant did not object. (ECF No. 274, PageID.4835.) Napolitano's testimony defining "diversion" did not draw on scientific, technical, or other specialized knowledge. Regardless, the definition of "diversion" was properly presented to the jury through Koczenasz's testimony. (ECF No. 275, PageID.5115–5116.) Defendant did not object to Koczenasz's testimony defining "diversion." (*Id.*)

During a different portion of the trial, Defendant did object to Napolitano's testimony regarding "the most commonly diverted prescriptions." (ECF No. 274, PageID.4843; *see id.* at PageID.4847.) Napolitano provided that testimony in discussing a summary chart he

created.[8] (*Id.* at PageID.4843.) The Court stands by its prior determination that the testimony was not complicated and did not involve "scientific, technical, or otherwise specialized knowledge." (*Id.* at PageID.4845.) To the extent this part of Napolitano's testimony strayed into expert testimony, Koczenasz identified the most commonly diverted drugs for the jury without an objection from Defendant. (ECF No. 276, PageID.5298 (Koczenasz: "We focused on the three [drugs] that were more or still are more commonly diverted."); ECF No. 297-3, PageID.5608; *see* ECF No. 275, PageID.5062 (Witness Darwin Smith:

---

[8] Defendant does not show that Napolitano's testimony regarding the summary charts he created was improper. The Sixth Circuit has stated that the Federal Rules of Evidence

> allow a witness to summarize voluminous writings or recordings. Under Federal Rule of Evidence 1006, a party may "use a summary . . . to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court," provided that the other party has been given an opportunity to examine the entire record. "[T]he *point* of Rule 1006 is to avoid introducing all the documents." *United States v. Faulkenberry*, 614 F.3d 573, 588–89 (6th Cir. 2010) (quoting *United States v. Hemphill*, 514 F.3d 1350, 1359 (D.C. Cir. 2008)). Because both parties possess the entire collection of recordings or writings, Rule 1006 witnesses can be cross-examined about the accuracy of their summaries.

*United States v. Kilpatrick*, 798 F.3d 365, 383 (6th Cir. 2015) (alteration and emphasis in original). As set forth above, Defendant received the underlying records used by Napolitano. (ECF No. 274, PageID.4858–4859.) Moreover, Defendant had an opportunity to cross-examine Napolitano about the summary charts.

"[O]xycodones 30 milligrams" were the most commonly filled prescriptions involving "patient recruiters.").)

With respect to Defendant's argument that Napolitano improperly testified as to "how investigators may search for evidence of possible diversion," the part of the transcript that Defendant cites does not contain testimony on this topic. (ECF No. 279, PageID.5441 (citing ECF No. 274, PageID.4832–4843).) The government suggests in its response that such testimony does not exist. (*See* ECF No. 297, PageID.5567 ("[Napolitano] did not provide 'opinions' regarding 'drug diversion and how investigators may search for evidence of possible diversion,' either generally or as to [Defendant], and [Defendant] cites no testimony supporting his argument.").) In his reply, Defendant asserts that "Napolitano testified about the processes used by HHS-OIG, FBI, and other agencies to investigate diversion cases." (ECF No. 302, PageID.5647.) That assertion, however, is unaccompanied by a citation to the record. The Court has been unable to locate the testimony Defendant references. It therefore cannot evaluate Defendant's argument. As a result, Defendant does not show that the Court erred and that he is entitled to relief on this basis.

For the reasons set forth above, the Court finds that Defendant's challenge to Napolitano's testimony fails. Defendant does not show that the Court committed a substantial legal error that prejudiced him and that warrants granting him a new trial.[9]

---

[9] Further, Defendant's arguments regarding Napolitano's testimony would be unlikely to succeed on appellate review. "Evidentiary rulings are typically reviewed [by the Sixth Circuit] under the abuse-of-discretion standard." *United States v. Burrell*, 114 F.4th 537, 556 (6th Cir. 2024) (citing *United States v. Jaffal*, 79 F.4th 582, 594 (6th Cir. 2023)); *see United States v. Gyamfi*, 805 F.3d 668, 672 (6th Cir. 2015) ("Although [the defendant] made three objections, we need not determine whether [defense] counsel sufficiently preserved the arguments he now makes on appeal, because [the defendant's] arguments fail whether we apply plain error review or the more demanding abuse of discretion scope of review."). In applying the abuse of discretion standard, the Sixth Circuit "will reverse only if such abuse caused more than harmless error." *Jaffal*, 79 F.4th at 602 (citing *United States v. Warshak*, 631 F.3d 266, 324 (6th Cir. 2010)). "An error is harmless 'unless it is more probable than not that the error materially affected the verdict.'" *Id.* (quoting *Warshak*, 631 F.3d at 324). The Sixth Circuit has also instructed that "[u]nder the 'harmless error' rule, Fed. R. Crim. P. 52(a), any 'error, defect, irregularity, or variance that does not affect substantial rights must be disregarded.'" *United States v. Kilpatrick*, 798 F.3d 365, 378 (6th Cir. 2015); *United States v. Howell*, 17 F.4th 673, 682 (6th Cir. 2021) ("We review for abuse of discretion and will 'reverse only where the district court's erroneous admission of evidence affects a substantial right of the party.'" (quoting *United States v. White*, 492 F.3d 380, 398 (6th Cir. 2007))).

Here, Defendant does not show that the Court abused its discretion in a way that materially impacted the verdict or affected his substantial rights. Defendant does not show that Napolitano's testimony was inaccurate or prejudicial. As noted above, other witnesses properly testified without objection as to some of the information provided by Napolitano. Even without Napolitano's testimony defining MAPS, drug schedules, and diversion, and without his testimony on the most commonly diverted prescription drugs, "there was overwhelming evidence of [Defendant's] guilt admitted at trial." *Howell*, 17 F.4th at 685 (internal quotation marks and citations omitted). Thus, Defendant does not demonstrate that any error

ii.   *Klein's Testimony*

Defendant argues that Klein's testimony "was expert testimony under the guise of a lay witness in direct conflict with Fed. R. Evid. 701(c)." (ECF No. 279, PageID.5443.) He does not argue that the testimony was inaccurate or prejudicial. Defendant does not demonstrate that a substantial legal error occurred with respect to Klein's testimony, as set forth below.

Defendant argues that Klein "provided fact and opinion testimony, as she discussed potential problems with [Defendant's] taxes and alluded that the reason for the amended tax filings was to hide his involvement with Tranquility Wellness Center." (*Id.* at PageID.5440.) But Defendant does not cite to where in the record Klein did such things. The government asserts that "she didn't" do them and that she "[i]nstead . . . testified to the facts from [Defendant's] tax documents, as shown in summary Exhibit 174, including that, for example, in [Defendant's] original and amended 2020 tax return he did not report income from Tranquility, and that he did report income from

---

in allowing Napolitano's testimony "caused more than harmless error." *Jaffal*, 79 F.4th at 602.

Tranquility in 2021." (ECF No. 297, PageID.5569 (citing ECF No. 274, PageID.4905–4910).)

Based on its own review of the relevant portion of the transcript (ECF No. 274, PageID.4904–4929), the Court agrees with the government's description of Klein's testimony. Klein discussed the numbers that she copied from Defendant's tax returns that appeared in her summary Exhibit 174—without identifying or suggesting that there was anything problematic about the information contained in the returns. The task of summarizing the financial records "required only everyday reasoning rather than specialized knowledge. Moreover, [Klein] did not go on to offer any conclusions as to what the data meant." *Faulkenberry*, 614 F.3d at 588. Her testimony thus constituted lay testimony. Defendant does not show that Klein impermissibly provided both lay and expert testimony. Therefore, Defendant's argument fails.

Defendant also argues that if Klein's testimony was based on

just math that anyone could do[,] . . . there would have been no need to create the summary exhibits used with her testimony to simplify the numbers for the jury to comprehend. The documents could have been admitted as

38

exhibits, as a lay person without expertise would have known where to find the relevant figures.

(ECF No. 279, PageID.5442–5443.) This argument lacks merit as well.

Defendant argues that Klein's summary exhibits and testimony were possibly unnecessary—but not that they were improper. It was permissible for Klein to testify as to the summary exhibits she created for this case, particularly given that Defendant had the underlying documents and an opportunity to cross-examine her. *Kilpatrick*, 798 F.3d at 383; Fed. R. Evid. 1006. (*See* ECF No. 274, PageID.4872–4873 (discussing the timely production of the bank records to Defendant); *id.* at PageID.4873 (indicating that there was no complaint by Defendant about the production of the underlying bank records); *id.* at PageID.4895 (reflecting no objection by Defendant to the admission of the bank records reviewed by Klein); *id.* at PageID.4905 (reflecting no objection by Defendant to the admission of the tax returns reviewed by Klein).) In addition, Klein's testimony was not expert testimony because by reviewing Defendant's underlying bank records and tax returns, a layperson could obtain the information regarding Defendant's finances that Klein presented in her summary exhibits. *See Kilpatrick*, 798 F.3d at 384–85 ("It was not an abuse of discretion for the district court to

39

conclude that mentioning the five percent standard fee was not expert testimony because a layperson could glean this information by reviewing the contracts." (internal citation omitted)); *id.* at 385 ("Although the[ ] references to laws and regulations had the ring of expert testimony or legal argument, one could also conclude that a layperson who studied the discovery materials . . . would have learned the basic contours of what it means to be a § 501(c)(4) corporation and the campaign contribution limitations of certain organizations." (citing Fed. R. Evid. 701 Advisory Committee Notes to 2000 Amendments)). Klein indicated that the information in her summary exhibits came directly from the records she reviewed; that she summarized the numbers but did not analyze them or make inferences about them; that she "left nothing out" and "took everything at face value"; that she did not consult tax codes, regulations, or rules; and that she did not use her knowledge as a Certified Public Accountant to create the exhibits. (ECF No. 274, PageID.4883–4891, 4894–4895, 4898, 4901, 4904–4909, 4922, 4924.) Thus, Defendant does not show that Klein's testimony discussing her summary exhibits was improper lay testimony under Rule 701 or that it constituted expert testimony under Rule 702. Fed. R. Evid. 701,

702. *See United States v. Higgins*, No. 22-3538, 2023 WL 6536752, at *5 (6th Cir. Oct. 6, 2023) ("But Sigler merely served as a summary witness. She did not testify as an expert pursuant to Fed. R. Evid. 702."); *United States v. Trotter*, No. 14-20273, 2017 WL 4112338, at *7 (E.D. Mich. Sept. 18, 2017) (finding that a witness "testified as a summary witness, not as an expert" because "he explained summary exhibits" and "did not interpret a patient file but rather simply testified to what the files did and did not contain"), *aff'd sub nom. United States v. Lovett*, 764 F. App'x 450 (6th Cir. 2019). Therefore, Defendant does not demonstrate that the Court committed a substantial legal error with respect to Klein's testimony.

In sum, Defendant does not show that the Court allowed Napolitano and Klein to provide improper lay testimony and that the Court committed a substantial legal error warranting a new trial.

### D. Additional Recording

Defendant argues that the Court erred "by failing to allow additional recordings to be played under the Rule of Completeness." (ECF No. 279, PageID.5443.) Yet it appears that only one recording is at issue. Defendant states that

> [a]t trial, Defendant recalled Angelo Smith and sought to impeach the witness on his original testimony. . . . As impeachment evidence, Defendant planned to introduce a portion of Government's Exhibit 99, which was a call[10] made between Verdell Lovett and Mr. Smith on February 4, 2021. R. 269, PageID # 3702.

(*Id.*) Defendant also states that he "sought to introduce [certain] exculpatory language in the recording. But the Court disagreed as to what it heard in the recording, and instead ruled that a portion of this statement was inadmissible. Thus, precluding Defendant from providing this information to the jury. R. 276, PageID # 5248." (ECF No. 279, PageID.5443.) As reflected in Defendant's own account of the trial proceedings—and in the trial transcript—Defendant did not argue during the trial that the recording should be introduced under the rule of completeness.[11] In his motion, Defendant does not show that the Court erred.

---

[10] As the government notes, the exhibit was not a "call"; rather, it was an audio recording of an in-person interaction at Tranquility. (ECF No. 297, PageID.5570 n.1 (citing ECF No. 269, PageID.3693–3699); *see* ECF No. 269, PageID.3691.)

[11] The government argues that Defendant's "failure to previously raise this argument [on the rule of completeness] and give the Court the opportunity to consider it means he cannot do so now and has waived the argument." (ECF No. 297, PageID.5572 (citing Fed. R. Crim. P. 51; Fed. R. Evid. 103).) In his reply, Defendant does not address the government's argument regarding waiver. (*See* ECF

"[T]he rule of completeness . . . was 'partially codified in Federal Rule of Evidence 106.'" *United States v. Donnell*, No. 21-3957, 2022 WL 10219848, at *4 (6th Cir. Oct. 18, 2022) (quoting *United States v. Crosgrove*, 637 F.3d 646, 661 (6th Cir. 2011)); *see* Fed. R. Evid. 106 Advisory Committee Notes to 2023 Amendments ("The intent of the amendment is to displace the common-law rule of completeness."). Rule 106 states: "If a party introduces all or part of a statement, an adverse party may require the introduction, at that time, of any other part—or any other statement—that in fairness ought to be considered at the same time. The adverse party may do so over a hearsay objection." Fed. R. Evid. 106 (effective Dec. 1, 2023).[12]

---

No. 302.) Defendant's failure to invoke the rule during the trial may limit his success on appeal—assuming he elects to take that route. *See* 21A Charles Alan Wright et al., *Fed. Prac. & Proc. Evid.* § 5073 (2d ed. 2024) ("[I]f the opponent neither invokes [Federal] Rule [of Evidence] 106 [on completeness] contemporaneously nor offers the evidence later, she cannot complain on appeal because the trial judge has committed no error." (citing *United States v. Allen*, 242 F. App'x 303, 309 (6th Cir. 2007))). The Court nevertheless considers Defendant's current argument on the rule of completeness. The Court finds that Defendant does not show that he is entitled to a new trial on this basis, as set forth above.

[12] In their filings, the parties reference the current version of Rule 106, which became effective on December 1, 2023. (*See* ECF No. 279, PageID.5443–5444; ECF No. 297, PageID.5572.) On that date, the trial was taking place. Because the parties appear to agree that the current version of Rule 106 applies, the Court applies that version of the rule as well.

"Rule 106 is intended to eliminate the misleading impression created by taking a statement out of context." *United States v. Nicoletti*, No. 15-20382, 2019 WL 1876814, at *3 (E.D. Mich. Apr. 26, 2019) (quoting *United States v. Costner*, 684 F.2d 370, 373 (6th Cir. 1982)); 21A Charles Alan Wright et al., *Fed. Prac. & Proc. Evid.* § 5077 (2d ed. 2024) ("[R]ule [106] rests on two 'considerations': first, the dangers of allowing one party to take statements out of context; and, second, the inadequacy of the common law remedy of delayed completeness."). "The doctrine of completeness . . . does [not] allow for the admission of other parts of the statement unless it is 'truly necessary to correct a "misleading impression"' resulting from the incomplete admitted portions." *Donnell*, 2022 WL 10219848, at *4 (quoting *Crosgrove*, 637 F.3d at 661). The Advisory Committee Notes to the 2023 Amendments to Rule 106 state that one of the amendments

> does not give a green light of admissibility to all excised portions of statements. It does not change the basic rule, which applies only to the narrow circumstances in which a party has created a misimpression about the statement, and

Wright and Miller indicates that despite the 2023 revision to Rule 106, the "fairness standard" was not "liberalized" and "prior case law on fairness still commands." 21A Charles Alan Wright et al., *Fed. Prac. & Proc. Evid.* § 5077 (2d ed. 2024). Therefore, the Court references cases that precede the 2023 Amendments to Rule 106 in discussing the fairness standard in this Opinion and Order.

the adverse party proffers a statement that in fact corrects the misimpression. The mere fact that a statement is probative and contradicts a statement offered by the opponent is not enough to justify completion under Rule 106. So, for example, the mere fact that a defendant denies guilt before later admitting it does not, without more, mandate the admission of his previous denial. *See United States v. Williams*, 930 F.3d 44 (2d Cir. 2019).

Fed. R. Evid. 106 Advisory Committee Notes to 2023 Amendments.

The Sixth Circuit has instructed that

[i]n ruling on a Rule 106 request:

> [T]he district court must determine "(1) whether the additional evidence explains the evidence already admitted; (2) whether it places the admitted evidence in its proper context; (3) whether its admission will serve to avoid misleading the trier of fact; and (4) whether its admission will insure a fair and impartial understanding of all of the evidence."

*Donnell*, 2022 WL 10219848, at *4 (quoting *United States v. McAllister*, 693 F.3d 572, 584 (6th Cir. 2012)).

Here, the Court notes as an initial matter that it allowed Defendant to play the recording at issue for the jury to impeach Smith. (ECF No. 276, PageID.5263–5264, 5266–5268.) Thus, Defendant's assertion that he was "preclud[ed] . . . from providing this information

45

to the jury" is incorrect. (ECF No. 279, PageID.5443.) Defendant cannot argue that he was prejudiced by the Court's failure to allow him to play the recording, given that he did in fact play it for the jury.

As for Defendant's argument regarding the rule of completeness, this argument fails. Defendant does not show that the introduction of the recording at issue was required under Rule 106. He does not establish that the admission of the recording was "'truly necessary to correct a "misleading impression"' resulting from the incomplete admitted portions." *Donnell*, 2022 WL 10219848, at *4. The previously admitted portions of the recording were identified as the government's Exhibits 99A and 99B. Those exhibits were played by the government during Lovett's testimony. (ECF No. 269, PageID.3693, 3698; ECF No. 297, PageID.5572.) After Exhibit 99A was played, Lovett testified that Smith said in the recording that:

- Defendant "was crying about the patients not going to physical therapy" (ECF No. 269, PageID.3695);

- Defendant "wanted the[ patients] to go [to physical therapy] at least once. They at least had to go one time or to have some type of

paperwork sent over from the therapy place saying that they received some type of service" (*id.* at PageID.3696); and

- Dwight Lunnon, a patient, "needed an MRI." (*Id.* at PageID.3697.)

After Exhibit 99B was played, Lovett testified that the exhibit recorded that:

- Lovett paid money to Smith for "four [patient] returns" (*id.* at PageID.3698, 3700); and

- Smith told Lovett: "give me an hour or two and I'll have [the doctor] to send th[e prescriptions] over." (*Id.* at PageID.3699.)

Defendant does not argue that Exhibits 99A and 99B gave the jury a "misleading impression" that needed to be corrected. *Donnell*, 2022 WL 10219848, at *4.

Under Rule 106's fairness standard, "[t]he court must determine whether or not what is missing changes the meaning of the part introduced." 21A Charles Alan Wright et al., *Fed. Prac. & Proc. Evid.* § 5077 (2d ed. 2024). Defendant does not show that the recording he sought to admit would change the meaning of the information presented in Exhibits 99A and 99B. The "specific language" he wanted admitted was Smith's statement that "[i]magine if it was the doctor that caught

47

[the fake MRIs] instead of my girl, he would be ready to get the f*** on, yep." (ECF No. 279, PageID.5444 (second alteration in original); *see* ECF No. 276, PageID.5192–5194, 5241–5242, 5244, 5254–5255, 5268 (Smith agreeing—after the recording was played for the jury—that "right around the 19:24 mark, [he] said, 'Imagine if it was the doctor that caught it [referring to the fake MRIs] instead of my girl'?").) This statement does not alter the meaning of Smith's statements recorded in Exhibits 99A and 99B regarding physical therapy, a patient needing an MRI, or the sale of prescription drugs.

Instead of arguing that the statements in Exhibits 99A and 99B gave the jury a "misleading impression," Defendant argues that "the precluded portion of the [recording] was both directly in conflict with the statements made earlier by Mr. Smith as to [Defendant's] knowledge of the conspiracy and doubled as exculpatory information." (ECF No. 279, PageID.5444 (citing ECF No. 276, PageID.5244–5245).) However, "[t]he mere fact that a statement is probative and contradicts a statement offered by the opponent is not enough to justify completion under Rule 106." Fed. R. Evid. 106 Advisory Committee Notes to 2023 Amendments. And to the extent Defendant argues that he wanted to

48

use "the precluded portion of the recording" to impeach Smith, the Court allowed him to do so, as noted above.[13] (ECF No. 276, PageID.5263–5264, 5266–5268.) Defendant's argument therefore lacks merit.

Thus, Defendant does not demonstrate that the recording should have been admitted under the rule of completeness. Defendant does not address the fairness standard under Rule 106. Nor does he address the factors the Court must consider in ruling on a Rule 106 request. Defendant does not show that (1) the recording "explains the evidence already admitted," (2) the recording "places the admitted evidence in its proper context," (3) the recording's "admission will serve to avoid misleading the trier of fact," and (4) the recording's admission "will insure a fair and impartial understanding of all of the evidence." *Donnell*, 2022 WL 10219848, at *4. Based on its own review of the factors, the Court finds that they do not favor admission.

Said differently, Defendant does not demonstrate that the recording at issue should have been admitted under Rule 106 because

---

[13] Moreover, Defendant's attorney mentioned the contents of "the precluded portion of the recording" during his closing argument to the jury. (ECF No. 273, PageID.4644 ("[O]n February 4, 2021, Angelo [Smith] was recorded, along with V[erdell Lovett], saying imagine if the doctor found out instead of my girl . . . .").)

he "has failed to explain how the admitted portions of the [recording] were misleading or how the entire [recording] would provide the proper context for the admitted portions." *Id.* (citing *McAllister*, 693 F.3d at 584). Therefore, Defendant's argument on the rule of completeness fails. *See* 21A Charles Alan Wright et al., *Fed. Prac. & Proc. Evid.* § 5077 (2d ed. 2024) ("Where the context adds nothing to the meaning of the proffered evidence, the court need go no further because a required element to the invocation of Rule 106 has not been proved." (footnotes omitted)). Defendant does not show that the Court made a mistake that justifies granting him a new trial.

### E. Jury Instruction on Deliberate Ignorance

Defendant argues that the Court erred in providing a jury instruction on deliberate ignorance. He argues that (1) the Court wrongly determined that the instruction was warranted based on binding Sixth Circuit precedent, (2) the Court failed to analyze a "two-factor test" set forth in *United States v. Mitchell*, 681 F.3d 867, 876 (6th Cir. 2012), and (3) the Sixth Circuit has "warn[ed] against [the] use" of the instruction. (ECF No. 279, PageID.5445.) These arguments lack

merit. Defendant does not show that the Court erred in giving the deliberate-ignorance jury instruction.

The Sixth Circuit has stated that

> [a] deliberate-ignorance instruction prevents a defendant from avoiding the consequences of his actions by closing his eyes to the obvious. *United States v. Mitchell*, 681 F.3d 867, 876 (6th Cir. 2012); *United States v. Geisen*, 612 F.3d 471, 485–86 (6th Cir. 2010). In pill-mill conspiracies, the instruction prevents clinic owners and providers from claiming a lack of knowledge of illegal operations despite awareness of serial red flags. *See, e.g.*, *United States v. Ashrafkhan*, 821 F. App'x 428, 435 (6th Cir. 2020); *United States v. Gowder*, 841 F. App'x 770, 783 (6th Cir. 2020); *United States v. Leman*, 574 F. App'x 699, 705–06 (6th Cir. 2014).

*United States v. Stanton*, 103 F.4th 1204, 1212–13 (6th Cir. 2024).

In this case, the Court provided the following deliberate-ignorance instruction to the jury:

> Next, I want to explain something about proving a defendant's knowledge. No one can avoid responsibility for a crime by deliberately ignoring the obvious.

> If you are convinced that the defendant deliberately ignored a high probability that he was issuing unauthorized prescriptions, that is prescriptions that were not issued for a legitimate medical purpose in the usual course of professional practice by a licensed doctor, then you may find that he knew about it.

But to find this, you must be convinced beyond a reasonable doubt that the defendant was aware of a high probability that he was issuing unauthorized prescriptions. That is prescriptions that were not issued for a legitimate medical purpose in the usual course of professional practice by a licensed doctor and that the defendant deliberately closed his eyes to what was obvious.

Carelessness or negligence or foolishness on his part is not the same as knowledge and it is not enough to convict. This, of course, is all for you to decide.

(ECF No. 273, PageID.4560.)

The language in the Court's instruction parallels language that the Sixth Circuit has found "comport[s] with" *Ruan v. United States*, 597 U.S. 450 (2022), a case in which the Supreme Court held "that the mens rea standard of 'knowingly or intentionally' applies to the entirety of § 841(a)[14]—including the 'except as authorized' clause." *United States v. Anderson*, 67 F.4th 755, 764 (6th Cir. 2023), *cert. denied*, 144 S. Ct.

---

[14] Section 841(a) provides:

Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally—

**(1)** to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance; or

**(2)** to create, distribute, or dispense, or possess with intent to distribute or dispense, a counterfeit substance.

21 U.S.C. § 841(a).

552 (2024). In subsequent Sixth Circuit cases, that court has upheld the use of a deliberate-ignorance instruction similar to the one used in this case. *See United States v. Hofstetter*, 80 F.4th 725, 730–31 (6th Cir. 2023), *cert. denied sub nom. Womack v. United States*, 144 S. Ct. 603 (2024), *and cert. denied sub nom. Clemons v. United States*, 144 S. Ct. 610 (2024), *and cert. denied sub nom. Newman v. United States*, 144 S. Ct. 612 (2024), *and cert. denied*, 144 S. Ct. 612 (2024); *Stanton*, 103 F.4th at 1212–14; *see also Stanton*, 103 F.4th at 1213 ("A deliberate ignorance instruction satisfies *Ruan* when, as here, it reminds the jury that this standard sits well above carelessness, negligence, and mistake." (citing *Anderson*, 67 F.4th at 766; *Hofstetter*, 80 F.4th at 731)).[15]

Here, Defendant first argues that two of the cases referenced above—*Anderson* and *Hofstetter*—did not provide a basis for the Court to find that the deliberate-ignorance instruction was warranted.[16] (ECF No. 279, PageID.5445.) But Defendant does not cite to any legal

---

[15] The Court notes that Defendant's attorney also represented the defendant in two of the Sixth Circuit cases cited above: (1) *United States v. Anderson*, 67 F.4th 755 (6th Cir. 2023), and (2) *United States v. Stanton*, 103 F.4th 1204 (6th Cir. 2024).

[16] The third case referenced above—*Stanton*—was decided after the trial in this case had concluded.

authority demonstrating that it was improper for the Court to consider those published Sixth Circuit cases in deciding to provide the instruction at issue. Nor does he demonstrate that he was prejudiced by the Court giving the instruction. He therefore does not show that the Court committed a substantial legal error.

In his remaining arguments related to the deliberate-ignorance instruction, Defendant notes the absence of an analysis of *Mitchell*'s "two-factor test" as well as the Sixth Circuit's warnings against the use of the instruction. (*Id.*) Defendant asserts that "[c]ourts are warned to only use this instruction after finding that the two factors exist: '(1) the defendant claims a lack of guilty knowledge; and (2) the facts and evidence support an inference of deliberate ignorance.'" (*Id.* (quoting *Mitchell*, 681 F.3d at 876).) Defendant does not analyze these factors himself. In its response, the government lists facts and evidence that demonstrate that it was appropriate to give the instruction. (ECF No. 297, PageID.5576–5577.) Defendant does not counter the government's list or the government's position. (*See* ECF No. 302.) In addition, Defendant does not show that he was prejudiced by the Court's failure to consider the factors he identifies.

The Court does not dispute that Sixth Circuit "case law makes clear that the decision to give [a deliberate-ignorance] instruction is to be approached with significant prudence and caution." *Mitchell*, 681 F.3d at 876. The Sixth Circuit has stated that "[t]o prevent juries from confusing the high standard of willful blindness with mere 'negligence, carelessness[,] or ignorance,' trial courts should provide this instruction only when the record could support this inference and the defendant claims a lack of knowledge." *Stanton*, 103 F.4th at 1213 (second alteration in original) (quoting *Mitchell*, 681 F.3d at 876).

Here, both factors are satisfied. First, Defendant claimed a lack of knowledge about any criminal activity occurring at Tranquility. (*See, e.g.*, ECF No. 273, PageID.4621 (Defense Counsel: "[T]his case really was about deception. And you [the jury] had an opportunity to see the level of deception that went on at the hands of Janeice [Burrell] and Angelo [Smith]. . . . There was no agreement [with Burrell]. . . . There was only deception."); *id.* at Page.ID.4625 ("Ladies and gentlemen, we are dealing with a now 74-year-old man who was 70 some years old at the time, not very tech savvy, dealing with somebody who knew her way in and out of Practice Fusion and knew [Defendant] from prior

employment."); *id.* at PageID.4627 (discussing "a really good example of Janeice Burrell's deception and it shows that she endeavored to stay one step ahead of [Defendant] discovering anything every single day"); *id.* at PageID.4628 ("Ladies and gentlemen, this is clear evidence that [Defendant] would not prescribe to patients without the deception of Janeice Burrell."); *id.* at PageID.4630–4631 ("[T]he only reason [Defendant] may have acted consistently with what Janeice Burrell and Angelo Smith wanted him to do was the deception that they engaged in."); *id.* at PageID.4631 (claiming that there was no evidence that Defendant had knowledge of patient marketers and no evidence that he knew drugs were going to patient marketers); *id.* at PageID.4632 (claiming that things were done at Tranquility "to suggest to [Defendant] that the practice wasn't the type of practice charging four or $500 for a prescription"); *id.* at PageID.4672 ("The deception in this case obliterates any theory that [Defendant] knew what was going on and that he was actually being deceived."); *id.* at PageID.4677 ("[Defendant] didn't know what Janeice Burrell and Angelo Smith were doing.").)

Second, the record supported an inference of deliberate ignorance. Burrell testified that Defendant "was paid in cash or through Zelle." (ECF No. 217, PageID.1136, 1211.) He was paid in cash at the end of a workday at Tranquility, and he was paid through Zelle when he was not at Tranquility. (*Id.* at PageID.1156, 1217.) Burrell and Defendant agreed that the amount he was paid depended on whether he was seeing a new patient or a return patient (for refills). (*Id.* at PageID.11435–1136, 1174; *see id.* at PageID.1179.)

Burrell testified that for return patients, someone who worked at Tranquility entered the individuals' names into Practice Fusion and let Defendant know the list in Practice Fusion was ready. (*Id.* at PageID.1137.) Defendant could access the list and would submit electronic prescriptions. (*Id.* at PageID.1138; *see id.* at PageID.1173, 1202, 1214.) If Defendant wrote a prescription for someone on the list of returns that was not a Schedule II controlled substance, he did not get paid for the prescription. (*Id.* at PageID.1138, 1209.) Defendant did not see the individual for a return visit. (*Id.* at PageID.1156; *see id.* at PageID.1173–1174.) Burrell testified that Defendant "did not review

urine drug screens" before refilling prescriptions. (ECF No. 218, PageID.1308.)

Individuals who obtained prescriptions from Defendant at Tranquility paid for them in cash based on the type of prescription they received. (ECF No. 217, PageID.1155.) According to Burrell, Defendant was aware that individuals paid in advance for opioid prescriptions. (*Id.* at PageID.1215; *see id.* at PageID.1216.)

Burrell testified that she believes Defendant never checked the urine drug screen results. (*Id.* at PageID.1172.) Burrell indicated that Defendant was aware that urine drug screens were being done, but he never asked her to see any results from the screenings. (*Id.* at PageID.1177.) Burrell never showed the urine drug screen results to Defendant, and he never asked for them. (*Id.* at PageID.1198.)

Burrell indicated that Defendant did not prepare return notes, did not conduct telemedicine, and did not communicate with patients by phone, email, or a messaging platform. (*Id.* at PageID.1210–1211.) Burrell testified that she told Defendant in a text message that a pharmacy was no longer accepting his prescriptions. (*Id.* at PageID.1219.)

58

Burrell indicated that Defendant questioned the authenticity and existence of MRIs and that "[h]e still prescribed." (*Id.* at PageID.1163; *see id.* at PageID.1190–1191, 1203–1204, 1213.) Burrell testified that Defendant mentioned to her that he thought MRIs or MAPS reports were fake, but he still prescribed controlled substances. (ECF No. 218, PageID.1241, 1348.) She indicated that Defendant "didn't review return patient MAPS" unless he asked the individual to come in. (*Id.* at PageID.1240, 1283.)

Burrell indicated that Defendant did not "ensure patients were going to physical therapy." (*Id.* at PageID.1343.) She also indicated that Defendant complained to her "that he thought the patients were faking it in terms of their physical exam," but he still prescribed controlled substances. (*Id.* at PageID.1242.) In addition, Burrell read a text message exchange between her and Defendant that indicated that he issued prescription drugs at her direction—based on whether an individual paid for them. (*Id.* at PageID.1243.)

Smith indicated that Defendant knew Tranquility was not billing insurance for office visits. (ECF No. 219, PageID.1400.) Smith indicated that Defendant was paid a certain amount per patient and depending

on whether it was a new patient (for which he conducted an office visit) or a return patient (for which he typically did not do an office visit or interact with the individual in issuing a refill prescription). (*Id.* at PageID.1394–1396, 1446; *see id.* at PageID.1440 (Defendant "stated to me that he didn't need to see the patients in order to refill them or that he didn't want to see them . . . after the initial first visit."); *id.* at PageID.1455 (testifying that he knew how much to pay Defendant by "calculat[ing] how many new patients he seen [sic] and plus the returns that [Smith] may owe him for for [sic] previous days").)

Smith also indicated that Defendant did not get paid for an office visit if he did not issue an opioid prescription. (*Id.* at PageID.1389; *see id.* at PageID.1483.) According to Smith, Defendant "knew that he would only get paid if he wrote a prescription" for controlled substances. (*Id.* at PageID.1395, 1435; ECF No. 220, PageID.1721.) That was the agreement that Smith negotiated with Defendant. (ECF No. 219, PageID.1435.) The amount Defendant was paid also depended on the type of opioid prescription he wrote. (ECF No. 220, PageID.1639.) Defendant kept notes on the number of prescriptions he wrote because

it would "impact his pay." (ECF No. 219, PageID.1438; *see id.* at PageID.1483–1484.)

In addition to depending on whether he wrote an opioid prescription, whether Defendant got paid depended on if the individual "received what he was looking for." (*Id.* at PageID.1395; *see id.* at PageID.1513.) Smith communicated to Defendant what an individual was seeking; Smith testified that "there were times when [Smith] went into the office and kind of nudged [Defendant] to write what [the patient or the recruiter] w[as] looking for." (*Id.* at PageID.1513; *see id.* at PageID.1523, 1584; *see id.* at PageID.1414 ("Sometimes we would go into his office and tell him what the patient was looking for or what they were previously being prescribed.").)

Smith testified that return patients received refill prescriptions based on their name appearing on a list in Practice Fusion. (*Id.* at PageID.1444–1445, 1449, 1453–1454; 1458, 1467; *see id.* at PageID.1514, 1527.) Defendant "still authorize[d] . . . returns" when he was out of town. (*Id.* at PageID.1519.) According to Smith, Defendant knew that more people than he saw as new patients came to Tranquility on days that Defendant was there based on the information

in Practice Fusion, the number of prescriptions written, and Defendant's ability to see the lobby virtually or in person. (*Id.* at PageID.1484–1485, 1487.)

Smith indicated that if Defendant was at Tranquility, Smith "would pay him at the end of the day by cash." (*Id.* at PageID.1454; *see id.* at PageID.1455; ECF No. 220, PageID.1721, 1723.) If Defendant was not at Tranquility, "[s]ometimes [Smith] would hold or wait until [Defendant] was into the office and then pay him for the return visits where he wasn't there and also the people that he seen the day that he was in the office." (ECF No. 219, PageID.1454.) Another way in which Smith paid Defendant was through Zelle. (*Id.* at PageID.1454, 1456, 1492, 1504, 1510.)

Smith indicated that there were times when Defendant noticed a problem with MRIs, with MAPS, and with information provided by patients during exams. (ECF No. 220, PageID.1721.) In most of those situations, Defendant still prescribed controlled substances. (*Id.*) Smith also indicated that Defendant made statements to Smith that made it seem like Defendant was aware that some of the MRIs were fake; they "had a conversation about the MRIs really not showing anything on it

or something didn't quite look right about the MRI." (ECF No. 219, PageID.1420; *see id.* at PageID.1421–1422.) On at least one occasion, Defendant expressed concerns about an MRI, but he still issued an opioid prescription. (*Id.* at PageID.1421–1422; *see id.* at PageID.1467–1468 (discussing "an example of how it normally worked with [Defendant]").) In addition, Smith indicated that he believed that Defendant was aware that some MAPS reports were fake based on statements made by Defendant or conversations between the two of them. (*Id.* at PageID.1433.) At least once, Defendant noticing a fake MAPS report did not prevent him from writing a controlled substance prescription. (*Id.* at PageID.1434.) Defendant never asked Smith why individuals were coming to see him at Tranquility when their MAPS report reflected that they had seen other doctors. (*Id.* at PageID.1415–1416.)

Smith testified that Defendant "complain[ed] about people not going to physical therapy." (*Id.* at PageID.1531.) If people did not do physical therapy, Defendant "[s]ome of the times [did] nothing. Sometimes he would stop prescribing. Sometimes he would do a decrease in a pain medication." (*Id.* at PageID.1532.)

Smith stated that he believes that Defendant did not review urine drug screen results. (*Id.* at PageID.1449, 1457.) Tranquility stopped using a certain lab to process its urine samples because Defendant "didn't want the[ lab] to have access to" Tranquility's electronic medical records, which would have allowed the lab to see Defendant's medical records and that Defendant "was writing the prescriptions each month without logging interaction with the patient." (*Id.* at PageID.1459–1460.) There was then a period when Tranquility "had no lab at all" between when it stopped using the lab and when it found another lab. (*Id.* at PageID.1461.) Defendant did not ask to see the results of a urine drug screen during that gap. (*Id.*) He did not look at urine drug screen lab results when Tranquility started using a different lab. (*Id.* at PageID.1462.)

Smith testified that he believes that Defendant did not check the physical files in the office or communicate with patients by phone or messaging. (*Id.* at PageID.1457; *see* PageID.1467–1468.) Smith testified that he informed Defendant that at least one pharmacy was no longer taking his prescriptions. (*Id.* at PageID.1503–1504.) Smith also testified that Defendant pre-signed otherwise blank prescriptions and left them

with Smith at Tranquility. (*Id.* at PageID.1541–1543.) Defendant did not prevent Smith from entering information in those prescriptions to prescribe controlled substances. (*Id.* at PageID.1543.) According to Smith, he and Burrell did not "trick" Defendant into giving them pre-signed prescriptions; Defendant "agree[d] to do that." (*Id.* at PageID.1544.)

The evidence discussed above and presented to the jury suggested that Defendant knew about fraudulent or altered MRIs, knew about fake MAPS reports, knew that patients were "faking it" during examinations, knew that patients were not going to physical therapy, knew that patients were paying for opioid prescriptions, and knew that a pharmacy stopped taking his prescriptions. Based on this evidence, as well as the evidence regarding Defendant's knowledge of how Tranquility operated and how he was compensated for his work there, "[t]he jury could permissibly find from th[e] evidence that [Defendant] deliberately avoided learning of [Tranquility's] illicit practices." *Stanton*, 103 F.4th at 1213. Thus, an analysis of the *Mitchell* factors does not establish that it was improper for the Court to give a deliberate-ignorance instruction.

Accordingly, Defendant does not show that the Court committed a substantial legal error in providing a deliberate-ignorance instruction to the jury.

### F. Cumulative Error

Defendant's final argument is that he should receive a new trial under "the cumulative error rule." (ECF No. 279, PageID.5446.) "To prevail under cumulative-error analysis, a defendant 'must show that the combined effect of individually harmless errors was so prejudicial as to render his trial fundamentally unfair.'" *United States v. Underwood*, 859 F.3d 386, 395 (6th Cir. 2017) (quoting *United States v. Warman*, 578 F.3d 320, 349 n.4 (6th Cir. 2009)); *United States v. Sypher*, 684 F.3d 622, 628 (6th Cir. 2012) ("To warrant a new trial, . . . the cumulative effect of the errors must have 'deprived [the defendant] of a trial consistent with constitutional guarantees of due process.'" (alteration in original) (quoting *United States v. Hernandez*, 227 F.3d 686, 697 (6th Cir. 2000); citing *United States v. Deitz*, 577 F.3d 672, 697 (6th Cir. 2009))). "Because cumulative error analysis examines only actual errors, 'the accumulation of non-errors cannot collectively amount to a violation of due process.'" *Underwood*, 859 F.3d at 395 (quoting

*Campbell v. United States*, 364 F.3d 727, 736 (6th Cir. 2004)); *United States v. Wheaton*, 517 F.3d 350, 372 (6th Cir. 2008) ("[C]umulative-error analysis permits us to look only at actual errors, not non-errors." (citing *Campbell*, 364 F.3d at 736)).

In this case, Defendant has not shown that the Court committed an actual error. As a result, there is no error for the Court to consider. His cumulative error argument therefore fails. Accordingly, Defendant is not entitled to a new trial based on cumulative error. *See Sypher*, 684 F.3d at 628–29 (concluding that the defendant "has not demonstrated that she is due a new trial" based on "cumulative error" because "[w]here . . . no individual ruling has been shown to be erroneous, there is no 'error' to consider, and the cumulative error doctrine does not warrant reversal"); *United States v. Lay*, 612 F.3d 440, 448 (6th Cir. 2010) ("[B]ecause [the defendant's] individual claims of error fail, [the defendant] was not entitled to a new trial based on cumulative error."); *Wheaton*, 517 F.3d at 372 ("[The defendant] has not shown that the district court committed any errors either at trial or in sentencing. His cumulative-error claim must therefore fail.").

67

## IV.    Conclusion

For the reasons set forth above, Defendant's motion for a new trial

(ECF No. 279) is DENIED.

IT IS SO ORDERED.

Dated: January 12, 2025             s/Judith E. Levy
      Ann Arbor, Michigan          JUDITH E. LEVY
                                  United States District Judge

## **CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or first-class U.S. mail addresses disclosed on the Notice of Electronic Filing on January 12, 2025.

                                  s/William Barkholz
                                  WILLIAM BARKHOLZ
                                  Case Manager